UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

Eastern District of Kentucky
F i L E D

JAN 2 0 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CIVIL ACTION NO. 05-37-GWU

RUSSELL D. HUFF,                                          PLAINTIFF,

VS.                    **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,              DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of his applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI). The appeal is currently before the Court on cross-motions

for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.  Is the claimant currently engaged in substantial gainful activity?
    If yes, the claimant is not disabled. If no, proceed to Step 2.
    See 20 C.F.R. 404.1520(b), 416.920(b).

2.  Does the claimant have any medically determinable physical
    or mental impairment(s)? If yes, proceed to Step 3. If no, the
    claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3.  Does the claimant have any severe impairment(s)--i.e., any
    impairment(s) significantly limiting the claimant's physical or
    mental ability to do basic work activities? If yes, proceed to

1

Huff

Step 4.  If no, the claimant is not disabled.  See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

4.      Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months?  If yes, proceed to Step 5.  If no, the claimant is not disabled.  See 20 C.F.R. 404.920(d), 416.920(d).

5.      Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)?  If yes, the claimant is disabled.  If no, proceed to Step 6.  See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6.      Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work?  If yes, the claimant was not disabled.  If no, proceed to Step 7.  See 20 C.F.R. 404.1520(e), 416.920(e).

7.      Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy?  If yes, the claimant is not disabled.  See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply.  Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence.  Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial

evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

3

Huff

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

Huff

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency

6

may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Russell D. Huff, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of cervical sprain, lumbar sprain, arthralgias and being status post a closed head injury. (Tr. 19). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mr. Huff retained the residual functional capacity to perform a significant number of light level occupations existing in the economy and, therefore, was not entitled to benefits. (Tr. 22-5). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs if he were capable of light level exertion, could only occasionally climb, bend, crouch, and crawl, and could not work around hazardous machinery or drive. (Tr. 503). The VE responded that there were jobs that such a person could perform, and proceeded

7

to give the numbers in which they existed in the regional and national economies. (Id.).

On appeal, this Court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence. The time frame involved in the present case ranges from the plaintiff's alleged onset date of September 7, 1997 through the date of the ALJ's decision, March 28, 2002. (Tr. 26, 74). However, there are two distinct periods. The plaintiff's Date Last Insured (DLI) was December 31, 1997 (Tr. 18), meaning that he needed to show disability prior to that date in order to be eligible for DIB. His SSI application is not affected by the DLI, but he would not be entitled to SSI benefits prior to February 25, 2000, the date of his SSI application. (Tr. 386-9).[1]

Both the plaintiff and the defendant discuss evidence which was not available to the ALJ in their briefs to the Court, but a review of the evidence that was submitted *to the ALJ* shows that it does provide substantial support for her decision.

Mr. Huff alleged disability due to a variety of conditions, primarily stemming from a head injury and a motor vehicle accident in September, 1997. (Tr. 74). Among the conditions alleged were upper and lower back injuries, injuries to the left

---

[1]The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after his application date. Casey v. Secretary of Health and Human Services, 987 F.2d 1230, 1233 (6th Cir. 1993).

eye and sinus area, and numbness of the left leg. (Tr. 74). Significantly, Mr. Huff also described having seizure-like episodes by the time of the August 22, 2001 hearing, and testified that he had been diagnosed as having post-traumatic epilepsy. (Tr. 45, 47-8). He was on a maximum dosage of an anti-seizure medication, but this had not been 100 percent effective, and he had been hospitalized only the previous week for a seizure. (Tr. 489-90). The seizures left him sleepy afterwards, and he also felt that he was on too much medication to drive. (Tr. 492). In addition, his doctor had told him a year ago not to drive. (Tr. 498).

The evidence regarding the plaintiff's condition prior to the DLI on December 31, 1997 clearly supports a finding that he was not entitled to DIB. After he was seen at a hospital on September 7, 1997 following a motor vehicle accident, Dr. Ahmad Ahmad noted only transient problems such as an abrasion on the left eye, and no focal neurological deficits. (Tr. 132-3). Subsequently, he was referred to a neurologist, Dr. James Bean, for evaluation of headaches, neck pain, and left eye pain, but Dr. Bean noted that a CT scan of the head and cervical spine x-rays were normal, and his examination was also normal. (Tr. 148). Dr. Bean obtained an MRI of the head to evaluate left orbital pain and headaches, but this was negative except for some frontal sinus mucosal thickening. (Tr. 147,150). The plaintiff was apparently also progressing in physical therapy, which Dr. Bean had recommended, and he stated on November 17, 1997 that Mr. Huff could return to work "after

Thanksgiving." (Tr. 147). Finally, on February 2, 1998, approximately one month after the DLI, Mr. Huff saw Dr. Bean with a complaint of pain in the left side of the neck causing a sensation of dizziness when he rotated his head slightly, not resolving with physical therapy. (Tr. 146). Once again, Dr. Bean's examination was normal, and, although the symptoms suggested only a chronic cervical sprain, he obtained an MRI of the cervical spine to rule out cervical disc disease. (Id.). The MRI was normal, and on February 16, 1998, Dr. Bean released Mr. Huff to return to work "tomorrow" with no permanent impairment. (Tr. 145, 149).

Since this is the only evidence that is contemporaneous to the DLI from a treating or examining source regarding work restrictions, it provides clear support for the ALJ's decision on the DIB claim.

Regarding the period for which Mr. Huff is eligible for SSI, the evidence shows that he sought treatment from Dr. Craig C. Cartia, a specialist in pain management, in December, 1999, complaining of a constant knifelike sensation in the head, constant pain fluctuating between his back and shoulder blades, spots before his eyes, intermittent lower back pain, muscle spasms, shivers, and shakes. (Tr. 339). Dr. Cartia reviewed many of the prior objective studies, including the MRI, which were normal, and requested Dr. Bean's records. (Id.). His physical examination showed that the plaintiff was in no apparent distress, although he described his current pain as being 9 and on a scale of 1 to 10, and although there were

10

complaints of pain on range of motion testing in the neck and lower back, his "breakaway" behavior on strength testing was not consistent with an inability to stand and walk. (Tr. 338, 340). Dr. Cartia was not clear if this behavior was as a result of pain or of lack of effort. (Tr. 338). His impression was of a motor vehicle accident with a significant amount of subjective complaints with "minimal objective findings" to correlate with the complaints. (Id.). He suggested having an examination by a neurologist, Dr. Alexander Tikhtman. (Id.).

Dr. Tikhtman initially examined the plaintiff on January 14, 2000, approximately five weeks before the SSI application, and noted that the plaintiff's affect was somewhat unusual, in that he squinted and grimaced at times for no apparent reason. (Tr. 308). Strength of his extremities, his coordination, and his deep tendon reflexes were all intact, as was sensation, although there was exquisite tenderness of the cervical and lumbosacral paraspinal regions on the left, and to a lesser degree on the right. (Tr. 309). Dr. Tikhtman also noted that Mr. Huff's gait was very stiff and unnatural and, although he told the physician that he could not walk on his toes and heels, he had a nearly normal range of lumbar movement with encouragement. (Id.). An EMG/NCV of the legs showed no evidence of lumbar radiculopathy, although there was evidence of muscle spasm. (Id.). Dr. Tikhtman diagnosed, among other items, post-traumatic headaches which appeared to be predominantly of myofascial causation, "apparently myofascial" neck and low back

11

pain, and "significant symptom magnification." (Id.). He recommended a trial of occipital nerve blocks, which were performed by Dr. Cartia, but Mr. Huff then began to complain of syncope and passing out episodes, which Dr. Cartia described as somewhat unusual. (Tr. 307, 331). In any event, Dr. Tikhtman obtained an EEG which was normal, and an electronystagmogram which showed no cause for dizziness. (Tr. 306-7). On June 30, 2000, Mr. Huff was having multiple complaints, including dizziness, and generally not feeling well, and believed that he might have lost consciousness again following an episode of neck discomfort while driving. (Tr. 303). Dr. Tikhtman instructed him not to drive again until further notice, and diagnosed cervicogenic headaches, probable vagal syncope, and likely anxiety and depression. (Id.). He prescribed Effexor, and recommended a psychological review.

Dr. John Ranseen, a licensed clinical psychologist, conducted an evaluation of Mr. Huff on July 31, 2000. (Tr. 312). He also reviewed Dr. Cartia's records. Mr. Huff stated that he had been disabled from working due to pain, physical limitations, and memory problems since the 1997 motor vehicle accident, and described a variety of problems since then, including poor sleep, decreased interest, short-term memory difficulties, and daily headaches. (Id.). Dr. Ranseen opined that Mr. Huff did not put forth adequate effort during testing, and noted specifically that he failed separate effort/motivation tests. (Tr. 314). However, achievement testing showed high school level reading, and an IQ score of 85, while other testing showed high

12

scores on somatization, obsessive-compulsive, depression, and anxiety scales. (Id.).  Dr. Ranseen concluded that he was not completely convinced that there was any evidence of diminished cognitive functioning, and that he had a sense of generalized overreporting of physical problems and of complaints of emotional dysfunction.   (Tr. 315).   His diagnosis was conversion disorder with a mixed presentation, and he suggested counseling.  (Id.).

In addition to referring the plaintiff to Dr. Tikhtman, Dr. Cartia referred Mr. Huff to Dr. Kenneth Lester for an orthopedic evaluation of his back pain.  Mr. Huff told Dr. Lester that he had pain in his head, neck, back, and left leg, and weakness in both legs as well as his neck, decreased memory, intermittent blindness in one eye, frequent 10 to 15 minute headaches, difficulty sleeping, and feelings of depression. (Tr. 325).  Dr. Lester's examination showed only diffuse tenderness of the neck and back, and he suggested a neuropsychological evaluation and a trial of the medication Paxil, along with "aggressive" physical therapy.  (Tr. 326).  On June 16, 2000, the plaintiff reported that therapy had helped some, and Dr. Lester indicated that he could work with restrictions.  (Tr. 323).  On September 22, 2000, Dr. Lester indicated that Mr. Huff was at maximum medical improvement, and that he should

discontinue physical therapy and have a functional capacity evaluation for permanent restrictions.  (Tr. 322).[2]

One of Dr. Cartia's colleagues, Dr. Ronald Newman, examined the plaintiff on November 17, 2000, and noted the results of Dr. Ranseen's testing.  He found an only mildly restricted range of motion of the cervical spine, equal reflexes, and only mild tenderness over the cervical paraspinal musculature.  (Tr. 328).  Dr. Newman assessed that Mr. Huff was stable, and "possibly had a mild closed head injury without real significant evidence of diminished function."  (Id.).

Also in 2000, state agency physicians had reviewed portions of the record and concluded that the plaintiff did not have a "severe" impairment.  (Tr. 341-4).

Dr. Lester examined the plaintiff again in January, 2001, at which time Mr. Huff reported that he was now on seizure medication.  (Tr. 357).  He was worried about a grinding sensation felt in his neck a couple of weeks ago, and Dr. Lester noted a reduced range of motion of the cervical spine due to pain, but otherwise the examination was normal.  (Tr. 357).  It was noted that an MRI of the cervical spine was negative.  (Id.).  Dr. Lester's form contained a section regarding work restrictions, but this section was not filled out, as it had not been filled out at any of Dr. Lester's previous evaluations.  (Id.).

---

[2]If such an evaluation was performed, the results did not appear in the Court transcript.

Dr. Tikhtman continued to treat Mr. Huff, and in November, 2000, he reported that he was doing much better on the anti-seizure medication Keppra. (Tr. 364). Dr. Tikhtman noted a diagnosis of probable post-traumatic epilepsy, and stated that the plaintiff should not do any driving or operation of machinery for three months after any spell suggestive of a seizure. (Id.). In May, 2001, Mr. Huff said that he was still having minor as well as major spells, and the dosage of Keppra was increased. (Tr. 363). He was advised to follow "seizure precautions" and follow-up in six months. Dr. Tikhtman added that, given the relative frequency of the episodes, he felt that Mr. Huff was "disabled for all types of employment." (Id.). A form prepared the same day indicated that the plaintiff was ordered to remain off work through November 1, 2001. (Tr. 365). Another visit on June 6, 2001 followed, however, with Mr. Huff reporting another seizure approximately two weeks earlier, and that since then there had been severe pain radiating from his lower back down to his left leg as well as some discomfort in his right arm. (Tr. 359). His physical examination was essentially unchanged, and an EMG/NCV of the left leg was normal. (Id.). Dr. Tikhtman listed his impression as a "breakthrough" seizure, rule out neck injury versus arousal of all symptoms, and suggested no driving until further notice.

Dr. Mark Burns conducted a consultative examination of the plaintiff on May 12, 2001, and also reviewed an extensive amount of records, including those from Dr. Bean, Dr. Lester, Dr. Tikhtman, and apparently from Dr. Cartia. (Tr. 353-5). His

physical examination showed that Mr. Huff weighed 212 pounds a height of 71 inches, his joints and back had no tenderness or spasm, there was a normal range of motion, a normal grip and ability to manipulate, a normal gait and station, and a normal ability to squat. (Tr. 349-50). In summary, the plaintiff had a normal orthopedic evaluation, although he had some pain, "but minimal difficulty" performing activities such as sitting, standing, moving about, lifting, carrying, and handling objects. (Tr. 350). He did not exhibit any of the signs of numbness which he had described. (Tr. 351). Dr. Burns concluded that Mr. Huff could perform "light" level exertion, and was able to sit four hours, stand four hours, and walk three hours each in an eight-hour day "with rests," that he could occasionally bend, squat, crawl, and climb, and frequently reach above shoulder level. (Tr. 352).

The ALJ submitted the evidence to Medical Expert (ME) Dr. Jack Scariano, a neurologist. The ME opined that Mr. Huff's "spells" were "not true clinical seizures," and that there had been no epilepsy documented on the EEG . (Tr. 378, 381). He felt that Mr. Huff had an atypical clinical presentation, with chronic symptom magnification in other body systems. (Tr. 381). He opined that there was no evidence of impairment. (Tr. 378).

The ALJ rejected Dr. Tikhtman's statement of disability on the ground that it was conclusory, and contradicted by other medical evidence. She essentially accepted the opinion of Dr. Burns, while adding restrictions on driving and operating

machinery. While Dr. Burns was a one-time examiner, he did have other evidence available for review from the treating sources, which adds considerably to the weight of his opinion. Furthermore, the opinions of other treating sources besides Dr. Tikhtman did not suggest total disability, but rather a large number of physical complaints with no objective findings. This view is supported by the opinion both of Dr. Burns and Dr. Scariano, who apparently had essentially all of the major medical exhibits available for review. Accordingly, the ALJ's residual functional capacity for the period relevant to the SSI application is also supported by substantial evidence.

After the ALJ issued her decision on March 28, 2002, additional evidence from Dr. Tikhtman and other sources was submitted to the Appeals Council. As previously stated, counsel for the plaintiff discusses this post-decision evidence as if it had been available to the ALJ, and does not specifically request a remand for consideration of new and material evidence under 42 U.S.C. Section 405(g). However, since a remand is requested generally, and since the new evidence is cited in the plaintiff's brief, the Court notes that where the Appeals Council considers new evidence but declines to review the application on the merits, a District Court can remand the case for further administrative proceedings if the claimant shows that the evidence is new and material, and that there was good cause for failing to present it to the ALJ. Cline v. Commissioner of Social Security, 96 F.3d 146,148 (6th Cir. 1996). No showing of "good cause" has been made. The new evidence

17

includes a letter dated May 7, 2002 from Dr. Tikhtman stating that Mr. Huff did not have epilepsy to the best of his knowledge, and he had referred Mr. Huff to a psychiatrist to evaluate possible psychiatric causes for his condition. (Tr. 401). No functional restrictions are suggested in this letter. Another letter dated April 1, 2002 states that Dr. Tikhtman "would defer any further diagnostic and prognostic assessments to his psychiatrist." (Tr. 427). However, he also signed a form for worker's compensation purposes on October 1, 2002, indicating that the plaintiff did not have the physical capacity to return to the type of work he performed at the time of his injuries, and he should perform no driving and "no manual labor." (Tr. 435). Yet another form, dated November 1, 2002, stated that the plaintiff was having one or two generalized seizures per week with loss of consciousness, which rendered him unable to function for the rest of the day, and that he might need to take unscheduled breaks as often as hourly. (Tr. 436-9). He added that the plaintiff had been "unable to work since '97," and that he should not work around heights, equipment/machinery, perform any lifting, bending, stooping, or undertake any repetitive use of his arms. (Tr. 439-439A). While Dr. Tikhtman's opinion that the plaintiff had been unable to work since 1997 is material, no good cause has been shown for failing to obtain the opinions earlier. Moreover, considering the contradictions in the various letters and forms, the evidence as a whole is of dubious materiality since it is not consistent. A reasonable fact finder could have found it to

Huff

be of little probative value.  Other new evidence submitted to the Appeals Council

includes a physical examination by Dr. James Templin on January 16, 2003, and a

psychological evaluation by C. Christopher Allen on January 29, 2003.  (Tr. 441-62).

Both of the sources reviewed prior records, and their findings at least arguably do

relate to the period before the ALJ's decision but, once again, no reason has been

advanced for failing to submit them earlier.

The decision will be affirmed.

This the _____*20*_____ day of January, 2006.


G. WIX UNTHANK
SENIOR JUDGE